[No. 15444-3-I. Division One. October 6, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. DENNIS JOSEPH COLLINS, *Appellant.*

*David Allen* and *Allen & Hansen, P.S.,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Linda Jacke, Deputy,* for respondent.

PEKELIS, J.—Dennis Joseph Collins appeals his conviction for one count of first degree murder and three counts of first degree assault while armed with a deadly weapon and a firearm. He alleges that the trial court erred (1) in admitting into evidence two prior noncriminal incidents, (2) in permitting the State to amend the information to add the alternative charge of felony murder by attempted second degree kidnapping, and (3) in erroneously instructing

the jury regarding the elements of attempted kidnapping and the definition of assault. We disagree and affirm the trial court.

On April 24, 1984, Collins was charged by information with one count of first degree murder and three counts of first degree assault with a deadly weapon and a firearm for an incident which left his wife dead and his oldest daughter, Domini, seriously injured. Dennis Collins and Eleanor Collins were married in 1959. They had six children: Domini, Elizabeth, Danny, Brian, Sean, and Maureen. Mr. Collins retired from the United States Marine Corps in 1979, moved the family to the Seattle area, and became a military instructor for the Marine Corps ROTC high school program in the Kent School District. Domini described the Collins marriage as not a very happy one. By the fall of 1983, the marriage had deteriorated to such an extent that Mrs. Collins asked Collins to leave the family home, and in December 1983, he moved into an apartment.

Dr. Allen Sterling, Mrs. Collins' father, testified that on December 28, 1983, he drove with her to Collins' apartment where he waited in the car while she went inside. In about 15 minutes she returned, distraught and weepy, telling her father that her husband had said "he's going to commit suicide, and he's not going alone." Shortly thereafter, Collins wrote suicide notes to her and the children and then made an unsuccessful suicide attempt.

Collins testified that on March 1, 1984, he went to the family home in Medina to talk to Mrs. Collins. He admitted there had been an order entered restraining him from going to the home. While there, he waved a .22 caliber revolver in front of his wife because he was desperate to talk to her and thought that was the only way she would talk seriously. After leaving the house, he returned to work and asked a custodian to take the gun from him because, as the custodian testified, they "both agreed that he shouldn't have the weapon".

Around April 12, 1984, Collins, who was familiar with firearms and a proficient shot, asked another custodian at

work for a gun so he could go to a firing range for target practice. Collins admitted that he misled the custodian as to why he wanted the gun. On Wednesday, April 18, the custodian brought the weapon to Collins, who said that he would use it the next evening.

On the evening of April 18, Collins borrowed a car, checked into a motel around 6 p.m. and asked the desk clerk for a 1 a.m. wake–up call so he could go fishing. He left the motel at approximately 1:30 a.m., stopped for a cup of coffee at a restaurant and then drove to the family home, parking the car on a nearby highway. He borrowed the car because the restraining order was still in effect and the Medina police knew what his car looked like.

Domini testified that she was dozing on the sofa when she heard footsteps coming upstairs from the bottom floor of the house proceeding to her mother's room and then the door to the room closing. Domini heard a loud noise and thought it was somebody falling out of bed. She went to her mother's room, opened the door, and asked: "What's going on here?" She saw her father standing at the end of the bed. He raised his arm and fired a shot at her mother, who was sitting on the bed. Collins raised the gun again and said: "Here, this is for you," and once more fired at her mother. Domini then saw her father grab her mother by the arm and saw her fall to the floor where she lay while he fired again. Collins turned and shot Domini in the chest before turning back to her mother and shooting at her two more times. Domini stated that she had a clear memory of the incident.

Elizabeth testified that she looked into the room and shouted for someone to call the police. She then got a canoe paddle, entered the room, and began hitting her father with it. Collins pointed the gun directly at her and then at her brother, Brian, who also heard the commotion and had come to investigate. He fired at each of them, but nothing happened. He then pointed the gun at himself, pulled the trigger, but once more the gun did not fire.

Elizabeth started hitting her father again, realizing that

he was out of bullets. When he began fumbling in his pockets, she was afraid that he was trying to reload his gun. She backed out of the room, yelling at him to leave and eventually chasing him out of the house. Elizabeth noted that on his way out, her father did not have to unlock the front door. Since the family always kept the door locked, she believed that it must have been unlocked before her father came upstairs.

Collins' version of what occurred after he arrived at the family home differed from that of his children. He testified that he approached the house and left a blue bag with bullets and suicide notes to his children near an outside entrance to Brian's room. He testified that he was going to commit suicide and had wanted to write to the people he thought were concerned. He entered the house through Brian's room, went up the stairs to the room that he and Mrs. Collins had shared, closed the door, and turned on the light. The gun was in his trousers, sticking out and obviously visible. Collins awakened his wife by putting his hand on her shoulder and saying: "El, . . . I have to talk to you. I want you to come with me." She looked at the gun and looked at him and asked: "Why? I don't understand." He testified that his plan was to get her away for a couple of days to see if they could straighten things out and that he took the gun because he did not think she would come any other way. However, he also testified that he would not have forced her to come at gunpoint, and if she had refused to come, he would have left and probably killed himself.

Collins further testified that his wife put some clothes on and sat on the edge of the bed. He handed her a pair of moccasins and a sweater, which she put on. Collins claimed that she then grabbed for the gun, and it was during their struggle over it that she was accidentally shot several times. Stunned by the shooting and the ensuing reaction of his children, Collins said to his son, who was standing in the doorway, "Brian, I'm sorry," then pointed the gun toward his heart and pulled the trigger, but nothing happened. Although Mrs. Collins had been hit four times, Collins tes-

tified that he did not see any sign that she had been injured in the struggle, and claimed that before Mrs. Collins was shot for the last time, neither of them ever had complete control over the gun. Collins admitted that he was confused as to what happened.

■ The jury found Collins guilty of all counts. On appeal, Collins alleges that the trial court violated ER 404(b) in admitting evidence regarding the December 28 incident where Mrs. Collins related to her father that her husband said: "[H]e's going to commit suicide, and he's not going alone." Collins discusses ER 404(b) at length in his brief, and only peripherally discusses ER 803(a)(2). However, the court admitted the evidence in rebuttal as an excited utterance, and Collins' trial counsel, who is not his counsel on appeal, never raised ER 404(b) as a basis for objection at trial. A party may only assign error in the appellate court on the specific ground of evidentiary objection made at trial. *State v. Guloy,* 104 Wn.2d 412, 421, 705 P.2d 1182 (1985), *cert. denied,* 106 S. Ct. 1208 (1986). Thus, Collins has lost his opportunity for review on the basis of ER 404(b).

Because Collins does object, albeit in cursory fashion, to the court's determination that the testimony was admissible as an excited utterance, we will address this issue. ER 803(a) provides in part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . .
>
> (2) *Excited Utterance.* A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

■ The excited utterance exception is based upon the assumption that under the circumstances described in the rule, there is little chance of misrepresentation or conscious fabrication, and thus the statement is inherently reliable. The key is spontaneity. *State v. Flett,* 40 Wn. App. 277, 286, 699 P.2d 774 (1985); 5A K. Tegland, Wash. Prac., *Evi-*

*dence* § 361, at 206 (2d ed. 1982). The components which must be present are (1) a startling event and (2) a spontaneous declaration caused by that event. *State v. Slider,* 38 Wn. App. 689, 692, 688 P.2d 538 (1984), *review denied,* 103 Wn.2d 1013 (1985). The startling event can be a statement made during the course of a conversation. *See United States Fire Ins. Co. v. Dace,* 305 N.W.2d 50, 55, (S.D. 1981). The spontaneous declaration, *i.e.,* "excited utterance," need not be contemporaneous[1] to the event so long as

> the statement was made while the declarant was still under the influence of the event to the extent that his statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment.

*Slider,* at 692 (quoting *Johnston v. Ohls,* 76 Wn.2d 398, 406, 457 P.2d 194 (1969)).

In the jury's absence, the trial court questioned Dr. Sterling, Mrs. Collins' father, regarding his daughter's demeanor and statements after her conversation with Collins. The court found that based on Dr. Sterling's observation of his daughter the criteria of reliability were met because the statement was made by Mrs. Collins while still clearly under the influence of the startling event.[2] This determination was within the sound discretion of the trial court. *See State v. Downey,* 27 Wn. App. 857, 860–61, 620 P.2d 539 (1980).

Collins cites *State v. Terrovona,* 105 Wn.2d 632, 716 P.2d 295 (1986), and *State v. Parr,* 93 Wn.2d 95, 606 P.2d 263

---

[1] In this regard, the excited utterance exception differs from the present sense impression exception embodied in ER 803(a)(1) which requires that the statement be made contemporaneously with the event it describes.

[2] We note that the record does not reveal when during the 15 minute meeting between husband and wife the statement was made, and thus there is no way to precisely ascertain the length of time between Collins' statement (the startling event) and Mrs. Collins' excited utterance to her father. While this inability to show that her utterance was contemporaneous to the event bars the use of the present sense impression exception, the application of the excited utterance exception is nevertheless proper so long as the declarant was under the influence of the startling event as the court found here.

(1980) in support of his contention that the evidence should have been excluded under ER 803(a)(2). However, since these cases discuss ER 803(a)(3), the state of mind exception to the hearsay rule, they are easily distinguished.

Collins also contends that despite the court's determination that the testimony fell under the excited utterance exception, it should have been excluded under ER 403 since it was irrelevant and unduly prejudicial. ER 401 provides:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

The probative value of the evidence on the issue of intent is clear. ER 403 provides, however:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

While Collins cited ER 403 as a basis for objection of the testimony at trial, he never expressly stated how he was unfairly prejudiced by the admission of the testimony.

 The trial court has broad discretion in balancing the probative value of evidence against its potential prejudicial impact, and the court's decision to admit relevant evidence will not be reversed absent manifest abuse of that discretion. *State v. Hughes,* 106 Wn.2d 176, 201–02, 721 P.2d 902 (1986); 5 K. Tegland, Wash. Prac., *Evidence* § 105, at 246 (2d ed. 1982).

> Broad discretion must be accorded to the trial judge in such matters for the reason that he is in a superior position to evaluate the impact of the evidence, since he sees the witnesses, defendant, jurors, and counsel, and their mannerisms and reactions. He is therefore able, on the basis of personal observation, to evaluate the impressions made by witnesses, whereas we must deal with the cold record.

(Citations omitted.) *State v. Coe,* 101 Wn.2d 772, 782, 684 P.2d 668 (1984) (quoting *United States v. Robinson,* 560

F.2d 507, 514 (2d Cir. 1977), *cert. denied,* 435 U.S. 905 (1978)). We find no abuse of discretion in the court's decision to admit the evidence of the December 28 incident.

Further, as the trial court noted, Collins first mentioned his attempted suicide on direct examination. This, in effect "opened the door" to further inquiries about the subject. "'It would be a curious rule of evidence which allowed one party to bring up a subject, drop it at a point where it might appear advantageous to him, and then bar the other party from all further inquiries about it.'" *State v. Bennett,* 42 Wn. App. 125, 127, 708 P.2d 1232 (1985) (quoting *State v. Gefeller,* 76 Wn.2d 449, 455, 458 P.2d 17 (1969)).

Collins also assigns error on the basis of ER 403 to the admission of the March 1 incident where he gave his gun to a co-worker.[3] However, it is the offer of proof, not the actual testimony which he argues in his brief is so prejudicial. Outside the presence of the jury, the deputy prosecutor advised the court that a co-worker would testify Collins told him, as Collins gave him the gun, he was afraid of what he might do with it. What the witness actually testified to, however, was only that they "both agreed that he shouldn't have the weapon", and it was not necessary for him to have it. The court properly ruled that this evidence was relevant to the issue of intent as related to premeditation, an element of first degree murder, and intent to kill, an element of first degree assault. The danger of unfair prejudice in admitting the statement as testified to by the co-worker is not apparent. The court did not abuse its discretion in admitting the testimony regarding the March 1 incident.

Collins next contends that the trial court erred when, after the defense had rested, it allowed the State to amend the information to add the alternative charge of first degree felony murder by attempted second degree kidnapping. Collins argues that there was no evidence to support the

---

[3]As previously discussed, we do not address his claim that the evidence should not have been admitted under ER 404(b), since again, this objection was never raised at trial.

amendment and that he was prejudiced thereby. Before the defendant's case in chief, the State attempted to add the alternative charge of first degree murder by commission of or the attempt to commit first or second degree kidnapping. The court did not allow the amendment until after Collins took the stand and testified that on the morning of April 19 he took the gun to the family home because he "did not think Mrs. Collins would come any other way." He had also stated that his plan was to get her away for a couple of days to see if they could straighten things out.

Collins relies on *State v. Green,* 94 Wn.2d 216, 616 P.2d 628 (1980), addressing sufficiency of the evidence in support of a conviction, to support his contention that there was a lack of evidence to establish a prima facie case of attempted kidnapping as charged in the amended information. In *Green,* the defendant moved an 8½–year–old girl no more than 50 or 60 feet before stabbing her to death with a butcher knife. Only 2 to 3 minutes had elapsed from the time the defendant first picked up the victim to the time he was seen holding her unconscious body. Under the circumstances of the case, the court concluded: "While movement of the victim occurred, the mere *incidental* restraint and movement of the victim which might occur during the course of a homicide are not, standing alone, indicia of a true kidnapping." *Green,* at 227.[4] The court further concluded that evidence of the killing itself did not establish the restraint necessary to prove kidnapping based on restraint by the use of deadly force under RCW 9A.40-

---

[4]The court went on to state:

"Although we characterize the movement and restraint in this case as *incidental,* we do not mean to suggest that under every conceivable set of facts a movement of 20 to 50 feet or being found in a stairwell would be *incidental.* That which constitutes *incidental* movement is not solely a matter of measuring feet and inches. It is a determination to be made under the facts of each case, in light of the totality of surrounding circumstances. This characterization is as much a consideration of the relation between the restraint and the homicide as it is a measure of the precise distance moved or place held. It involves an evaluation of the nature of the restraint in which distance is but one factor to be considered." *Green,* at 227.

.010(2)(b). *Green,* at 229. However, in this case not only was there a prima facie case, but viewing the evidence in the light most favorable to the prosecution any rational trier of fact could have found the elements of attempted second degree kidnapping. *Green,* at 221. Unlike *Green,* there was evidence in the statements by Collins regarding his intent to kidnap which was distinct from the evidence of the homicide, and evidence in the acts immediately preceding the shots being fired that Collins took a substantial step in the commission of the crime.

■ With respect to Collins's claim that he was prejudiced by the amendment, former CrR 2.1(d) provides: "The court may permit any information to be amended at any time before verdict or finding if substantial rights of the defendant are not prejudiced."[5] An amendment of the information is a matter addressed to the sound discretion of the trial court. *State v. Powell,* 34 Wn. App. 791, 793, 664 P.2d 1 (1983). A defendant cannot claim error from the amendment of an information unless he or she shows prejudice thereby. *State v. Laureano,* 101 Wn.2d 745, 761, 682 P.2d 889 (1984); *State v. Gosser,* 33 Wn. App. 428, 435, 656 P.2d 514 (1982).

The typical remedy for a defendant who is misled or surprised by the amendment is to move for a continuance so as to be able to prepare the requisite defense. *Laureano,* at 762. Collins' attorney did move for a continuance, and after a recess was provided so that he could talk with his client, counsel was unable to advise the court that he could or would be able to call any witnesses that would materially add to what was already in evidence. Under these circumstances, the court did not abuse its discretion in allowing the amendment and in denying the motion for a continuance.

Collins next contends that the trial court erred in giving jury instruction 7 defining attempted second degree kid-

---

[5]This provision is now found in CrR 2.1(e).

napping.[6] He argues that this instruction compelled the jury to convict him of first degree felony murder by attempted second degree kidnapping, even if it had a reasonable doubt as to whether he intended to force his wife into leaving the house with him. In essence, Mr. Collins seems to argue that the instruction was erroneous because it misstated the law and because there was not sufficient evidence of attempted second degree kidnapping. We have already outlined our reasons for finding that there was abundant evidence to support the determination that Collins took a substantial step in kidnapping his wife.

■ As to Collins' contention that the instruction misstated the law, RCW 9A.32.030(1)(c) provides that a person is guilty of first degree murder when committing or attempting to commit the crime of second degree kidnapping and in the course of and furtherance of such crime or in the immediate flight therefrom causes the death of a person other than one of the participants. Instruction 7

---

[6]Instruction 7 provides:

"A person also commits the crime of murder in the first degree when he attempts to commit kidnapping in the second degree, and in the course and furtherance of such crime he causes the death of a person other than one of the participants.

"A person commits the crime of kidnapping in the second degree when he or she intentionally abducts another person.

"A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he does any act which is a substantial step toward the commission of that crime.

"Abduct means to restrain a person by either secreting or holding the person in a place where that person is not likely to be found or using or threatening to use deadly force. Restraint means to restrict a person's movements without consent and without legal authority in a manner which interferes substantially with that person's liberty. Restraint is without consent if it is accomplished by physical force, intimidation or deception.

"It is a defense to a charge of kidnapping in the second degree that:

"(1) the abduction did not include the use of or intent to use or the treat [sic] to use deadly force; and

"(2) the defendant was a relative of the person abducted; and

"(3) the defendant's sole intent was to assume custody of that person.

"For the purposes of this defense, a relative is an ancestor, descendant or brother or sister, including a relative of the same degree through marriage or adoption, or a husband or wife."

correctly sets forth the applicable law as stated in RCW 9A.32.030(1)(c), and additionally defines second degree kidnapping, criminal attempt and the terms "abduct" and "restraint" as set forth in the applicable statutes. Finally, the instruction includes a statement of the defense to second degree kidnapping as set forth in RCW 9A.40.030(2). The court not only may, but should, use the language of a statute in instructing the jury where the law governing the case is expressed in the statute. *State v. Smith,* 31 Wn. App. 226, 229, 640 P.2d 25 (1982).

Instruction 7 neither misstates the law nor compelled the jury to find that Collins committed an attempted second degree kidnapping if it were only to find that he entered the bedroom with the gun in his trousers. Collins' argument is based upon his failure to recognize that both "restraint" and "abduct" are defined separately and must be read together. Abduct means the restraint of a person by *either* secreting or holding the person where that person is not likely to be found *or* by the use or threat to use deadly force. RCW 9A.40.010(2).

Finally, Collins contends that the trial court erred in giving instruction 15 regarding the definition of assault.[7] He argues that the last paragraph of this instruction was given in error because it negates the required intent to convict him of both first degree murder and first or second degree assault. Collins' attorney did not except to this instruction at trial. Defects in instructions not called to the trial court's attention will not be considered when raised for

---

[7]Instruction 15 provides:

"An assault is an act, with unlawful force, done with intent to inflict bodily injury upon another, tending, but failing to accomplish it, and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted, but it is sufficient if an apprehension and fear of bodily injury is created in another.

"An assault is also an intentional touching of the person or body of another, regardless of whether any actual physical harm is done to the other person.

"An assault is also an intentional act, with unlawful force, which creates in another a reasonable apprehension and fear of bodily injury, even though the actor did not actually intend to inflict bodily injury."

554

the first time on appeal unless the defect affects a constitutional right. *State v. Theroff,* 95 Wn.2d 385, 391, 622 P.2d 1240 (1980); *State v. Negrin,* 37 Wn. App. 516, 524, 681 P.2d 1287 (1984).

Citing *State v. Allen,* 101 Wn.2d 355, 678 P.2d 798 (1984), Collins claims that instruction 15 raises a constitutional issue because it involves proof of intent, an issue which may be raised for the first time on appeal. We find *Allen* distinguishable. In *Allen,* the court addressed the trial court's failure to give an instruction with the statutory definition of intent where this was an element of the crime charged. The court found that such an omission required reversal of the defendant's conviction for attempted second degree burglary. *Allen,* at 361–62. In contrast, here there was no such failure to instruct on a constitutional element. Collins merely objects to the inclusion of a superfluous final paragraph in a general definition of assault in instruction 15. This does not raise a constitutional issue.

We affirm the trial court.

SCHOLFIELD, C.J., and WEBSTER, J., concur.

Reconsideration denied November 25, 1986.

Review denied by Supreme Court March 3, 1987.